# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-CV-61769-GAYLES/STRAUSS

**CORPORATE INSURANCE ADVISORS, LLC,**

      **Plaintiff,**

**v.**

**BARBARA A. ADDEO, *et al*.,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** comes before me upon Corporate Insurance Advisors, LLC's ("Plaintiff's") Renewed and Expedited Motion for and Preliminary Injunction ("Motion for Preliminary Injunction"). (DE 8). The District Court has referred the case to me for rulings on all pre-trial, non-dispositive matters and for issuance of a Report and Recommendation on any dispositive matters. (DE 15). I have reviewed the Motion for Preliminary Injunction, the response ("Response") (DE 18), the reply ("Reply") (DE 20) and the record in this case. In addition, I held an evidentiary hearing ("Evidentiary Hearing") on the Motion for Preliminary Injunction. (DE 51). At the Evidentiary Hearing, I took testimony and reviewed evidence pertaining to this matter. Furthermore, I reviewed the parties' post-hearing briefs (DE 38-1; DE 39) with respect to the Evidentiary Hearing. Being otherwise duly advised, I respectfully **RECOMMEND** that the Motion for Preliminary Injunction (DE 8) be **GRANTED** for the reasons stated herein.

## FACTUAL BACKGROUND

This suit arises from Barbara Addeo, Lorraine Carrio, and Donna Marchese's (collectively, "Defendants") fractured business relationship with Plaintiff. (DE 1 at ¶9). On August 23, 2021,

Plaintiff filed an eight-count Initial Complaint ("Initial Complaint") against Defendants after they resigned, left to work for another company, and took clients they serviced while working with Plaintiff. (DE 1 at ¶12).   On November 16, 2021, Plaintiff filed a twelve-count Amended Complaint ("Amended Complaint"), which now includes the Liberty Company Insurance Brokers, Inc. ("Liberty Inc.") and the Liberty Company Insurance Brokers, LLC ("Liberty LLC"),[1] the company for which Defendants now work.  (DE 44).  Plaintiff's Amended Complaint alleges the following counts:

Count I (against Carrio) - Violation of the Federal Defend Trade Secrets Act ("FDTSA") (18 U.S.C § 1836)

Count II (against Addeo) - Violation of the FDTSA (18 U.S.C § 1836)

Count III (against Marchese) - Violation of the FDTSA (18 U.S.C § 1836)

Count IV (against Liberty Inc.) - Violation of the FDTSA (18 U.S.C § 1836)

Count V (against Liberty LLC) - Violation of the FDTSA (18 U.S.C § 1836)

Count VI (against Carrio) - Violation of the Florida Uniform Trade Secrets Act ("FUTSA") (§§ 688.001-688.009, Fla. Stat.)

Count VII (against Addeo) - Violation of the FUTSA (§§ 688.001-688.009, Fla. Stat.)

Count VIII (against Marchese) - Violation of the FUTSA (§§ 688.001-688.009, Fla. Stat.)

Count IX (against Liberty Inc.) - Violation of the FUTSA (§§ 688.001-688.009, Fla. Stat.)

Count X (against Liberty LLC) - Violation of the FUTSA (§§ 688.001-688.009, Fla. Stat.)

Count XI (against Carrio) - Breach of Contract

Count XII (against Addeo) - Breach of Contract

---

[1] Liberty Inc. and Liberty LLC will also be collectively referred to as "Liberty" below.

(DE 44 at ¶¶32-84). A week after Plaintiff filed its Initial Complaint, it filed the instant Motion for Preliminary Injunction. (DE 8). After I was referred the Motion for Preliminary Injunction, I held and evidentiary hearing on the motion. (DE 32; DE 51).

## FINDINGS OF FACT

Plaintiff is a company offering services related to the insurance industry at the commercial and individual level. (DE 44 at ¶4). Defendants were all affiliated with Plaintiff. (DE 44 at ¶11). Addeo and Carrio served as "Producers"[2] or insurance brokers for Plaintiff, and Marchese was Carrio's administrative assistant. (DE 44 at ¶11; DE 18 at ¶4). Addeo and Carrio each started their business relationships with Plaintiff on November 1, 2006 and held the titles of Vice President and Executive Vice President, respectively. (DE 44 at ¶11). Both signed Standard Employment Agreements that included, among other things, clauses regarding confidential information and non-solicitation. (DE 30-22; DE 30-23). Marchese, who is also Carrio's cousin, started working for Carrio in December 2015. (DE 29-7; DE 51 at 114). Marchese did not sign a Standard Employment Agreement with Plaintiff but did sign a Non-Compete Agreement with Plaintiff. *Id.*

Addeo and Carrio's Agreements identified the following items as "Confidential Information:"

- The identity of any client whose account constituted a Client Account of such specified Person at any time during the term of this Agreement or within the 24 months preceding termination of this Agreement, as well as the identity of any Active Prospective Client of such specified Person as of such date;

- The identity, authority and responsibilities of key contacts at each such client and Active Prospective Client;

- The service cost burden with respect to each such client and Active Prospective Client;

---

[2] Addeo and Carrio's contract with Plaintiff describes a "Producer" as an individual who is responsible for developing and maintaining accounts serviced by Plaintiff and soliciting new insurance clientele and customers. (DE 30-22 at 4; DE 30-23 at 4).

- The types of services, and insurance coverages, provided or to be provided specifically to any such client or Active Prospective Client;

- The specific insurance policies purchased by or for such clients or Active Prospective Clients;

- The expiration dates, commission rates, fees, premiums and other terms and conditions of such policies;

- The risk specifications and other characteristics, and claims loss histories of such clients or Active Prospective Clients;

- All internal memoranda and other office records, including electronic and data processing files and records;

- Any other information constituting a trade secret under the governing trade secrets law.

(DE 30-22 at 2-3; DE 30-23 at 2-3).  However, the Standard Employment Agreement noted that Addeo and Carrio were not obligated to protect "Confidential Information" information which: (i) entered the public domain through no fault of their own, (ii) was rightfully received by them through a third-party without breaching the agreement, (iii) was known, or received by them prior to disclosure or creation by Plaintiff, (iv) was developed independently without breaching the agreement, or (v) was provided by Plaintiff to a third party without similar restrictions.  (DE 30-22 at 3; DE 30-23 at 3).

The Standard Employment Agreement also contained the following pertinent provisions:

**6.1 Property of the Company.** Employee acknowledges and agrees that all Client Accounts, Client lists, Client contact and decision maker information, premiums, commissions, fees and other forms of compensation, and all Confidential Information of the Company or the Serviced CIA Companies relating thereto, which Employee generates in the course of providing, directly or indirectly, any CIA Business during the Term hereof (including such items resulting from or relating to services provided by Employee to the Serviced CIA Companies), shall be the sole property of the Company or such Serviced CIA Companies, as the case may be.

**6.2 Confidentiality during Term.** During the Term hereof and subject to the other provisions of this agreement, Employee will not use, or willfully disclose to any

4

Person, any Confidential Information. In addition, Employee will use reasonable efforts to prevent any such prohibited use or disclosure by any other person.

**6.3. Confidentiality following Term or following termination of Employee's employment with the Company.** Following the Term hereof for a period of twenty-four (24) months, and/or following termination of Employee's employment with the Company, or with its successor in interest, Employee will not use, directly or indirectly, or willfully disclose to any Person, any Confidential Information. In addition, Employee will use reasonable efforts to prevent any such prohibited use or disclosure by any other person.

**7.1 Non-Solicitation.** Except in the normal course of business on behalf of the Company or any Serviced CIA Company, Employee agrees that Employee will not, directly or indirectly, (a) solicit, sell, service, manage, provide, or accept any request to provide, or induce the termination, cancellation or non-renewal of, any CIA Business from or by any person, corporation, firm or other entity, (i) whose account constituted a Client Account of the Company or such Serviced CIA Company. The restrictions contained in this Section 7.1 shall apply throughout the Term hereof and thereafter until two (2) years after the effective date on which Employee's employment with the Company, or its successor in interest, terminates.

(DE 30-22 at 8-9; DE 30-23 at 8-9).

Marchese's Non-Compete Agreement also contained a similar prohibition, both during her employment with Plaintiff and twenty-four months after her employment ended, against soliciting, selling, servicing, consulting, accepting, managing, or otherwise seeking to acquire the business of any person or entity who was a client or active prospective client of Plaintiff "within the twenty-four (24) months preceding the cessation of Employee's employment." (DE 29-7).

On March 28, 2021, Carrio emailed Debra Powers, Plaintiff's Operations Manager, and asked for a complete list of her clients.  (DE 30-4 at 3).  Although Powers did not give Carrio a client list, she told Carrio that "you essentially have the information in the form of your expiration reports."  (DE 30-4 at 2).  These Expiration Reports had information regarding clients that Carrio and Addeo serviced while working for Plaintiff.  (DE 29-11; DE 30-3).  Specifically, the Expiration Reports included: client names, specific policy coverage types, name of the insurer providing coverage, policy number, expiration date of the policy, the annualized policy premium, the contact

information for each client, and the assigned Producer.  (DE 29-11; DE 39 at 2).  The Expiration Reports were generated monthly and were used to determine expiration dates for various policies several months in advance.  (DE 51 at 50).  Marchese obtained the Expiration Reports from Plaintiff's software database called EPIC, which was password protected. (DE 29-11; DE 39 at 2).  Plaintiff gave Marchese access to EPIC in June 2021.  (DE 51 at 21).  However, Marchese's access was limited to Carrio and Addeo's accounts.  (DE 51 at 27).  Before Plaintiff gave Marchese access, the administrative assistant to Mark Schwartz (Plaintiff's Chief Executive Officer) generated and sent the Expiration Reports to Defendants.  (DE 51 at 40-41).  Once Marchese had access to EPIC and could generate the Expiration Reports herself, she would forward the information to Carrio; typically, producers like Carrio and Addeo did not have access to EPIC. (DE 18-2; DE 30-3; DE 38-1 at 3).

EPIC also allowed Marchese to generate Summaries of Insurance.  (DE 29-8).  The Summaries of Insurance contained detailed information about the specific items for which each client had insurance coverage.  (DE 29-8A).  Utilizing the information she obtained from the EPIC database, Marchese would create an Excel spreadsheet that she entitled "Renewal List."  (DE 29-10A).  These Renewal Lists provided information regarding the policies coming up for renewal in each month such as the client names, client contact information (name, phone number, and email), and specific coverage types.  (DE 29-10).

On June 28, 2021 Carrio and Addeo filed suit against Plaintiff in state court for breach of contract.  (DE 29 at 12; DE 33 at 1).  Carrio and Addeo claimed that Plaintiff failed to pay them their wages and commissions.  (DE 18 at 1).  Marchese and Carrio also claimed that Plaintiff improperly deducted Marchese's salary from Carrio's commission checks.  (DE 18 at ¶7).  This claim was based on additional terms and conditions that were a part of Carrio and Addeo's

employment contract.  (DE 30-20; DE 30-21).  The additional term at issue stated that Carrio and Addeo would be provided an Executive Office Assistant, who would make $40,000.00 per year, "based on full $2,500,000 in revenue." (DE 30-20 at 16-17; DE 30-21 at 16-17).

The relationship between the Defendants and Plaintiff continued to sour, and Carrio and Addeo began looking for employment elsewhere.  (DE 51 at 72-73, 159).  Carrio began her discussions with Liberty in May 2021.  (DE 51 at 73).  It is not clear when Addeo began discussions with Liberty, but she testified that she received a job proposal from them after she filed the lawsuit in June 2021.  (DE 51 at 159).  On August 10, 2021, at Carrio's request, Marchese prepared and emailed to Carrio a Summary of Insurance for Nautica Community Association and Racquet Club Apartments.  (DE 29-8A; DE 29-8B).  On August 11, at Carrio's request, Marchese prepared and emailed to Carrio a Summary of Insurance for Fairways at Heron Bay Association. (DE 29-8C). Also, on August 11 (again at Carrio's request), Marchese emailed Carrio the Renewal List for September and October 2021. (DE 29-10A).  Carrio forwarded this email to her personal email address.  (DE 29-10B).  On August 12, upon Carrio's request, Marchese emailed Carrio the Renewal List for September through December 2021.  (DE 29-10C).  The same day, upon Carrio's request, Marchese emailed Carrio an Expiration Report for August 2021 through August 2022. (DE 29-11A; DE 51 at 53).  This Expiration Report contained information regarding 1,645 policies in which either Carrio or Addeo (or both Carrio and Addeo) were listed as the Producer.  (DE 29-11A).  Carrio also forwarded this email to her personal address. (DE 29-11B).

On August 15, at 12:43 A.M., Carrio sent an email with a Renewal Proposal to Waverly Surfside.  (DE 29-9).  That same day, at 3:00 PM, Carrio sent her formal letter of resignation to

Plaintiff, intending her resignation to take effect at midnight on August 16.[3]   (DE 29-13).

Marchese was unaware that Carrio was intending to resign.  (DE 38-1 at ¶8; DE 51 at 31, 36, 114).

Addeo submitted her formal resignation at 10:31 PM on August 15, intending her resignation to

take effect that day. (DE 29-14).  Notably, on August 15, Carrio also participated in a phone call

with officers of Liberty. (DE 30-25 at 3).   On August 16, 2021, Addeo and Carrio signed

agreements with Liberty and its affiliate Moody Insurance Group, Inc. ("Moody").   Liberty

authorized Carrio to reach out to past clients "assuming" those clients had "contact information

that [wa]s publicly available" and she did not have to rely "on information that might be considered

proprietary to [Plaintiff]."  (DE 30-25 at 3).

After August 16, 2021, numerous entities transferred their business from Plaintiff to

Liberty and Moody.  *See* (DE 29-17).  These entities included Nautica Community Association,

Racquet Club Apartments, Fairways at Herron Bay Association (entities whose Summaries of

Insurance Marchese had sent to Carrio before Carrio resigned), and Waverly Surfside (the entity

with whom Carrio had an email discussion).  (DE 29-17P; DE 29-17H; DE 29-17Q; DE 29-17A).

Carrio serviced these four entities while she was working with Plaintiff.  (DE 29-11A at 12-13, 16,

17, 45, 46).  Addeo also serviced some of the entities that have transferred their business from

Plaintiff to Liberty and Moody.  (DE 29-11A at 13, 17, 39).  For example, Addeo serviced

Waterford Courtyards in Jacaranda at Central Park Homeowners Association, Inc.,[4] and Redline

Motorsports Corporation, and both entities transferred from Plaintiff to Liberty and Moody after

---

[3] Although Carrio stated in her email to Plaintiff that her resignation was effective "[midnight] tonight August 15th 2021," she clarified at the hearing that she meant at midnight on August 16, 2021. (DE 51 at 59).

[4] The transfer letter for Waterford Courtyards is drafted in the same format and mistakenly lists the same policy number as the transfer letter for Waverly at Surfside. *Compare* (DE 29-17A) *with* (DE 29-17B). Waverly at Surfside was serviced by Carrio. (DE 29-11B).

she resigned.  (DE 29-17B; DE 29-17C).  Plaintiff also provided evidence of at least eleven other entities that have switched their business from Plaintiff to Liberty and Moody after Carrio and Addeo's resignation.  *See* (DE 29-17).  These seventeen entities were all listed on the Expiration Report Marchese sent to Carrio; some of those entities were also listed on the Renewal Lists Marchese sent to Carrio.  (DE 29-10; DE 29-11).  Plaintiff also contends that many more clients have transferred, and will continue to transfer, their business to Liberty and Moody if an injunction is not entered.  (DE 8 at 4; DE 44 at ¶30).  Thus, Plaintiff's Motion for Preliminary Injunction requests that the court enter an injunction (1) ordering Defendants to inventory and return all Plaintiff's information in their possession, custody, or control and (2) enjoining and restraining Defendants and all others in active concert or participation with them, who receive notice of the injunction, from directly or indirectly soliciting or diverting business from Plaintiff to Liberty and Moody. (DE 8 at 8; DE 39 at 15).

## ANALYSIS

### I.   Legal Standard

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Attorney Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020) (quoting *Northeastern Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)); *see also Brown v. Sec'y, U.S. Dep't of Health & Human Services*, 4 F.4th 1220, 1225 (11th Cir. 2021) (same).

As the Supreme Court has instructed:

Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing[,] and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the

merits. In light of these considerations, it is generally inappropriate for a federal
court at the preliminary-injunction stage to give a final judgment on the merits.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citations omitted).

"Upon application for injunctive relief, [Federal Rule of Civil Procedure 52] requires a
district court to hear the evidence in support of and opposition to the injunction and, whether the
court grants or denies the application, issue an order stating its findings of fact and conclusions of
law." *Georgia Advocacy Office v. Jackson*, 4 F.4th 1200, 1208 (11th Cir. 2021) (citing Fed. R.
Civ. Pro. 52(a)). And, "[i]f the court grants the injunction, it must state the reasons why it issued,
state the terms of the injunction specifically, and describe in 'reasonable detail . . . the act or acts
restrained or required.'" *Id.* (quoting Fed. R. Civ. Pro. 65(d)).

To obtain a preliminary injunction a movant must establish: (1) a substantial likelihood of
success on the merits of its claim at trial; (2) a substantial threat of irreparable harm to the movant
if injunctive relief is denied; (3) that the injury to the movant outweighs the potential harm that an
injunction may cause the defendant; and (4) an injunction will not disserve the public interest. *See
Superior Consulting Servs., Inc. v. Shaklee Corp.*, 710 Fed. Appx. 850, 853 (11th Cir. 2017). "A
preliminary injunction is an 'extraordinary and drastic remedy' and should not be granted unless
the movant clearly satisfies its burden of persuasion as to [these] four prerequisites." *Id.* (citations
omitted).

## II.      Conclusions of Law

### 1.   Substantial Likelihood of Success on the Merits

"The first element, substantial likelihood of succeeding on the merits, is generally regarded
as the most important because granting a motion for preliminary injunction would be inequitable
if the movant does not have a chance of success on the merits." *Imagine Commc'ns Corp. v.
Villegas*, 17-CV-20401, 2017 WL 10398556, at *2 (S.D. Fla. Nov. 29, 2017); *see also Gonzalez*

*ex rel. Gonzalez v. Reno*, 00-11424-D, 2000 WL 381901, at *1 (11th Cir. Apr. 19, 2000) (confirming that the first element is "generally" the most important); *Garcia-Mir v. Meese,* 781 F.2d 1450, 1453 (11th Cir.1986) (same).  This element is met "if good reasons for anticipating that result are demonstrated. It is not enough that a merely colorable claim is advanced." *S. Wine & Spirits of Am., Inc. v. Simpkins*, 10-21136-CIV, 2011 WL 124631, at *2 (S.D. Fla. Jan. 14, 2011) (quoting *City of Jacksonville v. Naegele Outdoor Adver. Co.*, 634 So. 2d 750, 753 (Fla. 1st DCA 1994)).

### A.   Breach of Employment Covenants

Plaintiff has shown a substantial likelihood of success on the merits of its breach of contract claims.  "A breach of contract claim under Florida law requires the existence of a contract, the breach of the contract, and damages resulting from the breach." *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1217 (11th Cir. 2018) (citing *DNA Sports Performance Lab, Inc. v. Club Atlantis Condo. Assoc., Inc.*, 219 So. 3d 107, 109 (Fla. 3d DCA 2017)).  When an employer plaintiff has alleged that a restrictive covenant has been breached, Florida Statutes Section 542.335 allows the employer to obtain an injunction to enforce that covenant upon a proper showing.  *See* Fla. Stat. § 543.335(1)(j).  This includes a showing of "(1) the existence of one or more legitimate business interests justifying the restriction; and (2) that the restriction is reasonably necessary to protect that interest." *See AutoNation, Inc. v. Mulleavey*, 19-60833-CIV, 2019 WL 4693575, at *4 (S.D. Fla. Aug. 22, 2019).  "Legitimate business interests" include: "(1) 'trade secrets, as defined by § 688.002(4)'; (2) 'valuable confidential business information or professional information that otherwise does not qualify as trade secrets'; and (3) 'substantial relationships with specific prospective or existing customers.'" *Id.* (quoting § 542.335(1)(b)).

Plaintiff contends that Addeo and Carrio both breached the Confidentiality (Section 6.2 and 6.3) and Non-Solicitation (Section 7.1) clauses in their Standard Employment Agreements. Plaintiff also contends that Marchese breached her Non-Compete Agreement.   Because these clauses are restrictive covenants, Plaintiff must meet the requirements in section 542.335(1)(j). *See Rauch, Weaver, Norfleet, Kurtz & Co., Inc. v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. 4th DCA 2021) (stating that noncompetition, nonsolicitation and confidentiality agreements are all restrictive covenants).   Here, Plaintiff has met these requirements.   First, the information contained within or generated by the EPIC database (i.e., the Expiration Reports and Summaries of Insurance) can be considered "trade secret" because the database contained client names, specific policy coverages, names of insurers, policy numbers, policy expiration dates, the amount of the policy premium, and important contact information. *See Mulleavey*, 19-60833-CIV, 2019 WL 4693575, at *3 (stating that customer lists, especially those with specific details, are considered trade secrets).   Even if the information does not meet the definition of "trade secret," it may still be classified as "valuable confidential business information" as it concerns the current and expected future insurance needs of Plaintiff's clients. *See Pitney Bowes Inc. v. Acevedo*, 08-21808-CIV, 2008 WL 2940667, at *3 (S.D. Fla. July 28, 2008).   Indeed, the definition of "Confidential Information" in Defendant Addeo and Carrio's agreements with Plaintiff clearly encompassed this information.   (DE 30-22 at 2; DE 30-23 at 2).   Similarly, Plaintiff clearly has "substantial relationships" with its current and prospective clients. *See Fortiline, Inc. v. Moody*, 12-CV-81271, 2013 WL 12101142, at *4 (S.D. Fla. Jan. 7, 2013) ("There is no question under Florida law that employers have a legitimate business interest in prohibiting the adverse solicitation of its customers with whom the employee has a relationship.").

12

Second, the restrictions in Plaintiff's Standard Employment Agreement and Non-Compete Agreement were "reasonably necessary" to protect its interests. Recall that Addeo and Carrio's agreements required them not to use or disclose Plaintiff's confidential information for a period of two years following the termination of their employment. (DE 30-22 at 8-9; DE 30-23 at 8-9). Their agreements also forbid them from directly or indirectly soliciting, selling, managing, providing, accepting any request to provide, or inducing the termination, cancellation, or non-renewal of Plaintiff's business for a period of two years after termination. (DE 30-22 at 9; DE 30-23 at 9). Marchese's agreement similarly prohibited her from "servicing" any of Plaintiff's clients or active prospective clients for two years after the end of her employment. Florida courts have held that restrictive covenants such as these help to prevent unfair competition between a former employee and their former employer. *See White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 786 (Fla. 2017); *Infinity Home Care, L.L.C. v. Amedisys Holding, LLC*, 180 So. 3d 1060, 1066 (Fla. 4th DCA 2015). These provisions are also reasonable (even though they do not have a geographic limitation) because they last than five years and do not prohibit Defendants from working in the industry and soliciting business from those in the public. *See* Fla. Stat. § 542.335(e) (stating that restrictions five years or less are presumed to be reasonable); *Envtl. Servs., Inc. v. Carter*, 9 So. 3d 1258, 1264 (Fla. 5th DCA 2009) (stating that non-compete agreements without a geographic limitation may still be upheld if they are otherwise narrow); *see also USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 188 (S.D.N.Y. 2011) (finding a non-solicitation provision including the *same* language as Addeo and Carrio's Standard Employment Agreement to be reasonable). Additionally, Defendants do not argue that the restrictions in their contracts are unreasonable or overbroad.

Finally, the evidence shows that Plaintiff has a substantial likelihood of success on its breach of contract claims.  Less than a week after they resigned with Plaintiff, Addeo and Carrio either "directly or indirectly" caused or managed the non-renewal of Plaintiff's business and are now "servicing" those clients on behalf of Liberty and Moody.[5]  Additionally, less than a week after her affiliation with Plaintiff ended, Marchese "serviced" Plaintiff's former clients on Carrio and Liberty and Moody's behalf.  (DE 29-17E; DE 51 at 33-34).  Plaintiff has lost business as a result of Defendants' departure and actions while employed with Liberty.

Defendants proffer several affirmative defenses.[6]  First, they argue that Plaintiff cannot seek to enforce the restrictive covenants because Plaintiff has breached their respective contracts in several ways, most significantly by not paying them the amounts due under the contract.  They claim that they were not paid wages and commissions.  Second, Defendants argue that the client information belonged to Addeo and Carrio and was "converted or stolen" by Plaintiff and that Plaintiff has "unclean hands."  Because these arguments are interrelated, they will be addressed together.

Defendants each make specific claims regarding what Plaintiff owes them.  Carrio claims that Plaintiff failed to pay her commissions on many of the accounts she brought to the company before she started working with them and developed while there.  (DE 51 at 121-22).  Carrio also claims that Marchese's salary was improperly deducted from her commission checks. (DE 51 at 125).  Finally, Carrio claims that she was not paid her wages for August 2021.  (DE 51 at 121).

---

[5] At the hearing, Carrio and Addeo claimed that most of their former clients called or reached out to them and that they did not "solicit" their business.  (DE 51 at 103, 166).  Even if that is true, the clear language of their Standard Employment Agreement precludes "accepting" such business.  (DE 30-22 at 8-9; DE 30-23 at 8-9).

[6] Notably, Defendants' post-hearing brief does not argue that Defendants have not breached the non-solicitation clauses of their agreements.  (DE 38-1 at 13).  Rather, it focuses on the affirmative defense of antecedent breach.  (DE 38-1 at 13-14).

Like Carrio, Addeo claims that Plaintiff (1) failed to pay her commissions on the accounts she brought to the company and the accounts she developed while working there and (2) failed to pay her wages for August 2021. (DE 51 at 163-64). Marchese claims that Plaintiff did not pay her for her final three weeks. (DE 51 at 39).

Defendants are correct that Plaintiff cannot obtain an injunction if it has committed an antecedent breach of the Standard Employment Agreement by failing to pay the Defendants what they are owed. *See Simpkins*, 10-21136-CIV, 2011 WL 124631, at *7; *Benemerito & Flores, M.D.'s, P.A. v. Roche*, 751 So. 2d 91, 93 (Fla. 4th DCA 1999). However, it is not clear that Plaintiff failed to pay Defendants *before* they resigned and started servicing former clients at Liberty. *See Simpkins*, 10-21136-CIV, 2011 WL 124631, at *7 (confirming that a plaintiff's breach must be antecedent to the defendant's breach). Carrio and Addeo's claim that Plaintiff did not properly pay their commissions is largely based on their allegation that Plaintiff "converted" their accounts into house accounts.[7] However, at least at this stage of the proceedings, Carrio and Addeo have not presented sufficient evidence for the Court to determine that Plaintiff did not pay their commissions at the proper rate.

Defendants argue that a provision in the contract allowing them to purchase their book of business (the "Book of Business Buy-Out") created an ambiguity as to who owns the client relationships and information. (DE 30-22 at 12; DE 30-23 at 12). However, this argument is unavailing. As an initial matter, the non-solicitation portion of Plaintiff's Standard Employment Agreement unambiguously states that Defendants may not accept or service the clients at issue for a period of twenty-four months after termination. (DE 30-22 at 9; DE 30-23 at 9). Additionally,

---

[7] Per the Standard Employment Agreement, an employee who is the originating producer of an account receives a larger percentage of the commission than does an employee who is not the originating producer. (DE 30-22 at 6-7; DE 30-23 at 6-7).

Plaintiff's Standard Employment Agreement states that client accounts are the property of Plaintiff.  (DE 30-22 at 8; DE 30-23 at 8).  Thus, the employment agreement is not ambiguous as to who owns the client accounts during the term of the agreement.

While the Book of Business Buy-Out appears to grant Addeo and Carrio an interest in their book of business upon termination of their employment with Plaintiff, it does not appear that they invoked it.  (DE 51 at 135).  The provision states that the employee must notify the company of their intent to exercise the buyout in writing within one hundred and twenty (120) days of the termination of their employment, and there is no indication that Addeo or Carrio have done this. *See id.*  Furthermore, the provision also states that the employee loses the right to compensation for their book of business if they breach the confidentiality or non-solicitation portions of the agreement.  *See id.*  Thus, given the fact that Addeo and Carrio are servicing Plaintiff's former clients with Liberty (without formally invoking the Book of Business Buy-Out) after their employment with Plaintiff ended, the book of business buy-out provision would not apply.

Regarding Plaintiff's deduction of Marchese's salary from Carrio's commission, Plaintiff contends that Addeo and Carrio did not reach the allotted revenue of $2,500,000.  Although Carrio stated that she had a $21,000,000 book of business, she was unable to state whether that amount (or a certain percentage of that amount) equated to "revenue."  Thus, Defendants are unable to show that Plaintiff failed to pay what the contract required on this basis.

Finally, regarding Plaintiff's alleged failure to pay Defendants' wages, Plaintiff stated at the hearing that it paid (or was in the process of paying) Marchese's salary for the final three weeks.  (DE 51 at 186-87); *Charles Schwab & Co., Inc. v. McMurry*, 208-CV-534-FTM-29SPC, 2008 WL 5381922, at *2 (M.D. Fla. Dec. 23, 2008) (finding that an employer's delay in payment does not equate to an antecedent breach of an employment contract).  Although Plaintiff admitted

16

that it did not pay Addeo and Carrio's salary for August, this would not have been antecedent to their breach of the agreements. *See Simpkins*, 10-21136-CIV, 2011 WL 124631, at *7 (noting that the plaintiff's breach must be antecedent to the defendant's breach to constitute an affirmative defense).

Accordingly, Plaintiff has shown a substantial likelihood of success on its contract claims.

### B.    Trade Secret Claims

Plaintiff has shown a substantial likelihood of success on its federal and state law trade secret claims against Carrio.  The FDTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  To obtain injunctive relief under the FDTSA, a plaintiff must prove either "actual" or "threatened" misappropriation. *See* 18 U.S.C. § 1836(3)(A)(i).  The FUTSA similarly provides a cause of action for the misappropriation of trade secrets.  *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018) (citing Fla. Stat. §§ 688.001-009).  To obtain injunctive relief under the FUTSA, a plaintiff must also prove "actual" or "threatened" misappropriation. *See* Fla. Stat. § 688.003.

### a.   Qualification as Trade Secret

 "Trade secrets" are defined broadly under the FDTSA as:

[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled,    or    memorialized    physically,    electronically,    graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

The FUTSA also defines "trade secrets" broadly:

information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

I find that Plaintiff has demonstrated a substantial likelihood of proving that the information within the Expiration Report, Summaries of Insurance, and Expiration Lists constituted trade secrets under both the FDTSA and FUTSA. These documents contained confidential information regarding client names, specific policy coverage types, the name of the insurer providing coverage, policy numbers, policy expiration dates, the annualized policy premium, the contact information for each client. (DE 29-10; DE 29-11; DE 39 at 2); *Mulleavey*, 19-60833-CIV, 2019 WL 4693575, at *3 (stating that customer lists, especially those with specific details, are considered trade secrets); *Pinch A Penny, Inc. v. SR & JG, Inc.*, 9:15-CV-80067, 2017 WL 5763118, at *9 (S.D. Fla. Sept. 19, 2017) (stating that a customer list with names, addresses, phone numbers, pool sizes, number of store visits, and purchase history was trade secret). Plaintiff has shown that it took "reasonable" measures and efforts to maintain the secrecy of this information as the information contained within the reports was all generated from EPIC, the password protected software that Plaintiff used. (DE 29-11; DE 39 at 2). Typically, Plaintiff did

18

not give Producers access to this software. (DE 30-4).  Carrio had to rely on Marchese, whom Plaintiff gave access to the software, to send her the information.  (DE 38-1 at 3).

Defendants lodge several challenges to the classification of the information as trade secret. First, they state that there is "ambiguity as to who owned the client information." (DE 38-1 at 10). They argue that many of the accounts listed in the Expiration Report belonged to Addeo and Carrio and were improperly converted to Plaintiff's accounts.  (DE 38-1 at 10).  However, as stated in the breach of employment covenant section above, Defendants have not shown that Plaintiff "improperly converted" anything.  More importantly, Defendants fail to rebut the provision in their Standard Employment Agreement that states client accounts and confidential information are the property of Plaintiff.  (DE 30-22 at 8; DE 30-23 at 8).  Next, Defendants argue that the information was not trade secret because Marchese generated the Renewal Lists on her own and saved them on her computer.  However, this argument does not consider the fact that Marchese created the Renewal Lists by using information she obtained from EPIC, Plaintiff's password-protected database.  Finally, Defendants argue that Plaintiff's disclosure of the information to others who have no obligation to protect it defeats its claim of trade secret but fail to point out the "others" they refer to.  (DE 38-1 at 10).  To the extent that Defendants argue that the contents of the Expiration Report and Summaries of Insurance are not trade secrets because the information about each individual insured is also known to that insured's insurer, their argument is unavailing.  While individual items of information may be known to the insurance companies (or the insureds themselves), the compilation of this information from aggregate sources may still constitute a protectable trade secret.  *See Mulleavey*, 19-60833-CIV, 2019 WL 4693575, at *3.  Additionally, to the extent that Plaintiffs are referring to any of the Defendants, their argument fails because they were all obligated to refrain from directly or indirectly using or disclosing Plaintiff's confidential

information under their Standard Employment Agreements (Carrio and Addeo) and Non-Compete

Agreement (Marchese).  Thus, the information at issue here (which was contained in the Renewal

Lists, Expiration Reports, and Summaries of Insurance) will likely qualify as trade secrets.

### b.  Misappropriation

 The FDTSA defines "misappropriation" as

(A) acquisition of a trade secret of another by a person who knows or has reason to
   know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent
by a person who—

> (i) used improper means to acquire knowledge of the trade secret;

> (ii) at the time of disclosure or use, knew or had reason to know that the
> knowledge of the trade secret was—

>> (I)    derived from or through a person who had used improper
>>        means to acquire the trade secret;

>> (II)   acquired under circumstances giving rise to a duty to
>>        maintain the secrecy of the trade secret or limit the use of the
>>        trade secret; or

>> (III)  derived from or through a person who owed a duty to the
>>        person seeking relief to maintain the secrecy of the trade
>>        secret or limit the use of the trade secret; or

> (iii) before a material change of the position of the person, knew or had
> reason to know that—

>> (I)    the trade secret was a trade secret; and

>> (II)   knowledge of the trade secret had been acquired by accident
>>        or mistake

18  U.S.C.  §  1839(5).   Under  the  FDTSA,  "improper  means"  includes  "theft,  bribery,

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage

through electronic or other means."  18 U.S.C. § 1839(6).

Similarly, the FUTSA defines misappropriation as the:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    1.  Used improper means to acquire knowledge of the trade secret; or

    2.  At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

        a.  Derived from or through a person who had utilized improper means to acquire it;

        b.  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        c.  Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    3.  Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2).  As in the FDTSA, "improper means" under the FUTSA includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  *See* Fla. Stat. § 688.002(1).

I find that there is a strong likelihood that Plaintiff will succeed on its misappropriation claims against Carrio.  Several days before Carrio resigned, she requested that Marchese send her the Renewal Lists for October and September 2021 and a copy of her Expiration Report.  The Renewal Lists contained information regarding policies that needed to be renewed and the Expiration Report contained the complete list of clients that Carrio serviced while working for Plaintiff.  Shortly after Carrio received these emails from Marchese on her work email address (with Plaintiff), she forwarded them to her personal email address. *See Mulleavey*, 19-60833-CIV,

2019 WL 4693575, at *4 (finding a substantial likelihood of success on a misappropriation claim where the defendant forwarded the plaintiff's customer information to his personal email); *Autonation, Inc. v. Peters*, 16-60010-CIV, 2016 WL 1722365, at *4 (S.D. Fla. Apr. 29, 2016) (same). Once Carrio went to work for Liberty, various clients who were listed on both the Renewal Lists and the Expiration Report transferred their business from Plaintiff to Liberty. To determine that these clients had policies coming up for renewal and to complete these transfers, Carrio likely utilized the information on the Expiration Reports, Renewal Lists and Summaries of Insurance. Thus, the evidence shows that Carrio likely misappropriated Plaintiff's confidential information. *See* 18 U.S.C. §§ 1839(5)(A), (B); Fla. Stat. §§ 688.002(a), (b); *see also New Country Motor Cars of Palm Beach, LLC v. Beresford*, 17-80856-CIV, 2019 WL 3890456, at *8 (S.D. Fla. May 3, 2019) (stating that "[m]isappropriation . . . is a forgone conclusion where a trusted employee discloses trade secrets after receiving them under circumstances of obvious confidentiality and contractual obligations" (citations omitted)). Notably, Carrio still has some of Plaintiff's confidential information in her possession. (DE 51 at 153).

Carrio contends that she asked Marchese to send her the Expiration Reports because she wanted to confirm that Plaintiff was "wrongfully converting" her clients. However, I do not find this contention to be credible. As Carrio instituted a state court suit based on similar claims in June 2021, it is puzzling that she would not have obtained this information earlier. Carrio also contends that she asked Marchese to send her the Summaries of Insurance for Waverly at Surfside, Nautica Community, Racquet Club Apartments, and Herron Bay Association because she was preparing for upcoming meetings with those entities. Although Carrio may have had meetings with these clients while she was still employed with Plaintiff, her admission to engaging in discussions with Liberty and Moody as early as May 2021 (and "well before" August 10, 2021

when she requested the Summaries of Insurance) indicates that these meetings were likely attempts to solicit those clients for Liberty and Moody. *See* (DE 51 at 73-74). Additionally, Carrio fails to provide a purpose for her request of the Expiration Report for September 2021 through December 2021.[8] Thus, the timing and content of Carrio's requests provides strong evidence of her intent to utilize Plaintiff's confidential information upon her employment with Liberty and Moody. *See Autonation, Inc. v. Peters*, 16-60010-CIV, 2016 WL 1722365, at *4.

Despite the above finding regarding Carrio, I do not find that Plaintiff has shown that it is likely to succeed on its misappropriation claims against Marchese and Addeo. With respect to Marchese, Plaintiff has not yet shown that she misappropriated its confidential information. When Marchese obtained the trade secret information from EPIC and sent it to Carrio, she did so when she was affiliated with Plaintiff and had its express permission to do so. Marchese testified that when Carrio requested the information it was "business as usual" and that she was not aware that Carrio intended to resign shortly thereafter. Therefore, she had no reason to think the information would be misused when she provided it to Carrio. Thus, the evidence does not show that Marchese misappropriated Plaintiff's confidential information when she sent it to Carrio on August 11 or 12. *See* 18 U.S.C. § 1839(5) (stating that misappropriation requires a defendant to "know[] or ha[ve] reason to know"); *see also* Fla. Stat. § 688.002(2) (same). Further, Plaintiff has failed to show that Marchese took, received, or utilized any of Plaintiff's confidential information *after* she resigned. Additionally, without more evidence, the Court's findings regarding Carrio cannot be imputed to

---

[8] Defendants appear to contend that Powers' directive for Carrio to utilize the Expiration Report as a client list excuses Carrio's actions. (DE 18 at 4; DE 51 at 128). However, this contention is unpersuasive. Carrio was still obligated to keep the information in the Expiration Report confidential during her employment and twenty-four months after termination. (DE 30-23 at 9). Carrio was also strictly prohibited from either directly or indirectly using the information for twenty-four months after termination. *Id.* Nothing in Powers' suggestion that the Expiration Report essentially contains all the information of a client list excused these obligations.

Marchese simply because she is Carrio's secretary. *See Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1286 (M.D. Fla. 2001) (stating that there was insufficient evidence to impute a finding of misappropriation from one defendant to another).

With respect to Addeo, Plaintiff concedes that it does not have direct proof that she misappropriated its information. (DE 39 at 9). Despite this concession, Plaintiff contends that there is a threat of misappropriation. (DE 39 at 10). Plaintiff notes that such a threat exists because "some of the information misappropriated by Carrio pertains to separate specific clients serviced by Addeo." (DE 39 at 9). Plaintiff also contends that the mistake on the transfer letter for Addeo's client Waterford Courtyards (it utilized the policy number for one of Carrio's clients) provides circumstantial evidence to support such a finding. While Plaintiff's evidence supports its claim that Addeo breached her Standard Employment Agreement, I do not find that it establishes misappropriation or the threat thereof. Specifically, Plaintiff has not sufficiently proven that Addeo took, received, or utilized any of its confidential information either before or after she resigned. *See Villegas*, 17-CV-20401, 2017 WL 10398556, at *11. Defendants state that Liberty and Moody directed them not to use Plaintiff's confidential information. (DE 30-25). Addeo also testified that she received the information from her clients directly. (DE 51 at 159).

### 2. Substantial Threat of Irreparable Harm

"[P]reventing irreparable harm in the future is the sine qua non of injunctive relief." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133 (11th Cir. 2005). Irreparable harm presupposes an injury that is "neither remote nor speculative, but actual and imminent." *Carbone v. Ocean Breeze Recovery, LLC*, 15-61700-CIV, 2015 WL 11201203, at *5 (S.D. Fla. Oct. 7, 2015) (quoting *Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285). "[T]he loss of customers and goodwill is an irreparable injury." *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d

767, 780 (11th Cir. 2015) (quoting *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)); *Southeastern Mech. Servs., Inc. v. Brody*, 8:08-CV-1151-T-30EAJ, 2008 WL 4613046, at *15 (M.D. Fla. Oct. 15, 2008) (stating that once a defendant solicits a plaintiff's customers using the plaintiff's confidential information, the customers cannot be "unsolicited"). "Furthermore, when the damages that might be suffered are speculative—as in the case of misappropriated trade secrets—the harm is properly characterized as irreparable because an inadequate remedy at law is presumed." *All Leisure Holidays Ltd. v. Novello*, 12-62328-CIV, 2012 WL 5932364, at *5 (S.D. Fla. Nov. 27, 2012); *see also VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1362 (S.D. Fla. 2012) ("In order for an injury to be irreparable, it cannot be undone through monetary remedies.").

I find that Plaintiff has made the requisite showing of irreparable harm.  It has shown that it lost customers after Defendants resigned and will continue to lose customers if an injunction is not entered.  These customers, who are now being serviced by Defendants (in violation of their respective agreements) at Liberty and Moody, were on the Expiration Lists and Renewal Lists that Marchese sent to Carrio.  Additionally, Florida presumes irreparable injury in cases such as these involving restrictive covenants and misappropriated trade secrets. *See TransUnion Risk & Alt. Data Sols., Inc. v. Challa*, 676 Fed. Appx. 822, 825 (11th Cir. 2017); *Confianca Moving, Inc. v. De Oliveira*, 10-23035-CIV, 2011 WL 13269500, at *6 (S.D. Fla. Jan. 24, 2011).  *But see Everest Nat'l Ins. Co. v. Rockhill Ins. Co.*, 8:16-CV-2803-T-35JSS, 2016 WL 8914546, at *6 (M.D. Fla. Nov. 10, 2016) (questioning the presumption of irreparable harm in misappropriation of trade secrets cases).  Such a presumption is warranted here where Addeo and Carrio have stated that they intend to continue servicing clients that they serviced while working with Plaintiff.  (DE 51 at 119, 163); *see Mulleavey*, 19-60833-CIV, 2019 WL 4693575, at *5 (finding irreparable injury

where a former employee retained a former employer's confidential information and was actively engaged in business with their customers).

### 3. Injury to Movant Outweighs Harm to Defendant

This factor "requires that the movant prove that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant." *City of S. Miami v. Desantis*, 408 F. Supp. 3d 1266, 1307 (S.D. Fla. 2019).  Thus, the court must "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  In disputes between an employer and its former employee, "[c]ourts do not hesitate to find that an injunction's potentially severe impact upon a former employee does not outweigh harm to the former employer for purposes of granting a preliminary injunction as long as the employee has potential for employment that would not violate the non-competition agreement." *See United Subcontractors, Inc. v. Godwin*, 11-81329-CIV, 2012 WL 1593173, at *12 (S.D. Fla. Feb. 3, 2012).

As stated above, the harm to Plaintiff will be great if an injunction is not issued. Defendants, on the other hand, have offered no evidence as to the harm that losing the ability to service clients they previously serviced while working for Plaintiff would cause them.  It will certainly be harder for Defendants to establish a book of business at Liberty without access to clients with whom they already have established relationships.  However, Defendants are not prohibited from working in the insurance industry and are free to compete with Plaintiff for new business, diminishing the harm that Defendants will suffer is diminished. *See id.*  Moreover, the prohibition against soliciting former clients was a clear element of the Standard Employment Agreements Addeo and Carrio signed, and Marchese also signed a Non-Compete Agreement. *See*

*Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004).  Accordingly, I find that the injury to Plaintiff outweighs the potential injury to Defendants.

### 4.  Injunction Will Not Disserve the Public Interest

The public has an "interest in upholding and protecting freedom to contract and to enforce contractual rights and obligations." *Mohr v. Bank of New York Mellon Corp.*, 393 Fed. Appx. 639, 646 (11th Cir. 2010).  More specifically, "[t]he Florida Legislature has determined that injunctions to protect trade secrets and restrictive covenants serve the public interest." *Mulleavey*, 19-60833-CIV, 2019 WL 4693575, at *5; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Silcox*, No. 01–8800–CIV, 2001 WL 1200656, *6 (S.D.Fla. Oct.4, 2001) (same).

I find that the public interest will be served by the grant of the injunction in this case. Defendants signed valid contracts and the Florida Legislature has determined that injunctions designed to protect those contracts serve the public interest.  *See Mulleavey*, 2019 WL 4693575, at *5.   Defendants argue that an injunction is not in the public interest because there have been various complaints about Plaintiff's service.  (DE 38-1 at 16).  However, Defendants fail to point to any authority which states that customer complaints such as these override the general interest that the public has in upholding the freedom to contract and enforce contractual rights and obligations.  *See Mohr*, 393 Fed. Appx. at 646.  Moreover, the injunction hardly requires any customers who are dissatisfied with Plaintiff's service to continue as Plaintiff's customers.  They are free to seek services from any insurance broker (other than Defendants).  Therefore, the public interest supports the grant of an injunction here.

### 5.  Bond

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay

the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  "[I]t is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court."  *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (citations omitted). Notwithstanding the language in Rule 65, a trial court also has the discretion to require no security at all.  *See id.*  However, especially given the potential for the Defendants to ultimately prove their prior-breach defense with additional evidence, a bond is warranted here.

"Under Florida law, a 'proper bond' is required to issue an injunction enforcing a non-compete agreement."  *See Pitney Bowes Inc.*, 08-21808-CIV, 2008 WL 2940667, at *6 (citing Fla. Stat. § 542.335(j)).  "Generally, the amount of the bond in this type of cases reflects the potential loss of salary reduced by the possibility of other employment opportunities in non-restricted areas and other mitigating factors."  *Pitney Bowes Inc.*, 08-21808-CIV, 2008 WL 2940667, at *6; *see also Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 466 (M.D.N.C. 2015) (determining bond on projected loss gross revenue).  The burden is on the party seeking security to establish a rational basis for the bond amount.  *See VAS Aero Servs., LLC*, 860 F. Supp. 2d at 1364.

Neither party has presented any evidence on the amount of a bond that would be proper in this case.  Thus, I recommend that the court order the parties to provide good faith estimates of the amount that would compensate Defendants if it is later determined that they were wrongfully restrained.  *See Tancogne v. Tomjai Enters. Corp.*, 408 F. Supp. 2d 1237, 1252 (S.D. Fla. 2005). This will enable the court to properly rule on the bond issue.

### III. Conclusion

In conclusion, I find that Plaintiff established all four prerequisites for a preliminary injunction based on its breach of contract (as to all Defendants) and trade secret misappropriation claims (as to Carrio only). Thus, I respectfully **RECOMMEND** that:

1. Plaintiff's motion for preliminary injunction be **GRANTED**.

2. Defendants be ordered to inventory and return all information belonging to Plaintiff that is in their possession, custody, or control.[9]

3. Defendants, their agents, servants, employees, and all others in active concert or participation with them who receive actual notice of the court's order be enjoined and restrained for a period of twelve months from directly or indirectly soliciting, selling, servicing, managing, providing, or accepting any request to provide, or inducing the termination, cancellation or non-renewal of Plaintiff's Business from or by any person, corporation, firm or other entity, whose account constituted a Client Account of Plaintiff's.

4. The parties be advised that the restrictions in the above paragraph should not apply to those who have already transferred their business from Plaintiff as of the date of this report and recommendation.

5. The parties be ordered to provide the Court with supplemental briefing providing a good faith assessment of the sum that would compensate the Defendants if it is determined that they were wrongfully restrained. Should the parties fail to provide the

---

[9] Although Plaintiff alleged that its request for Addeo and Marchese to inventory and return its information was supported by its trade secret claims (*see* DE 8 at 8), I find that it is also supported by the confidentiality portions of the Standard Employment Agreement. (DE 30-22 at 9; DE 30-23 at 9) (stating that the employee will not "directly or indirectly" use confidential information).

Court with a proposed sum, the bond issue may be deemed waived.  *See Tancogne*, 408 F. Supp. 2d at 1252.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 8th day of December 2021.

Jared M. Strauss
United States Magistrate Judge